NOT DESIGNATED FOR PUBLICATION

No. 117,756

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ROY D. BROWN,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; DAVID J. KAUFMAN, judge. Opinion filed July 27, 2018. Affirmed in part and remanded with directions.

*Clayton J. Perkins*, of Kansas Appellate Defender Office, for appellant.

*Boyd K. Isherwood*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., MCANANY and BRUNS, JJ.

PER CURIAM: Roy D. Brown appeals the trial court's judgment denying his presentencing motion to withdraw plea. He also challenges an alleged error concerning his journal entry of judgment. Brown's plea withdrawal argument hinges on his belief the trial court abused its discretion when it found that his attorneys did not coerce him to accept his plea agreement or to enter his plea. Brown also argues that his journal entry of judgment improperly states that he was convicted of "aggravated kidnapping" when he was actually convicted of a severity level four "aggravated battery." Indeed, the prison

1

sentence the trial court actually imposed on Brown was for the severity level four aggravated battery, not aggravated kidnapping. See K.S.A. 21-6804(a). Moreover, the State concedes that this matter should be remanded to the trial court for the entry of a nunc pro tunc order correcting this errant reference to the aggravated kidnapping conviction in Brown's journal entry of judgment.

Because of the State's concession and this court's long history of remanding to the trial court to issue nunc pro tunc orders for the correcting of clerical errors, we remand to the trial court with directions that it issue Brown a nunc pro tunc journal entry of judgment deleting the errant reference to the aggravated kidnapping conviction. See *State v. Bailey*, 306 Kan. 393, 397-98, 394 P.3d 831 (2017). Nevertheless, we reject Brown's argument concerning his motion to withdraw plea. Accordingly, we affirm in part and remand with directions as previously stated.

The State charged Brown with aggravated kidnapping, a severity level one person felony in violation of K.S.A. 2015 Supp. 21-5408(b), aggravated robbery, a severity level three person felony in violation of K.S.A. 2015 Supp. 21-5420(b)(1), and aggravated battery, a severity level four person felony in violation of K.S.A. 2015 Supp. 21-5413(b)(1)(A). The State's charges stemmed from an alleged altercation between Brown and his ex-girlfriend on October 12, 2015. Brown's seven-year-old son witnessed the entire alleged altercation. In his interview with the police, Brown's seven-year-old son made statements to the police suggesting that his father had committed the crimes against the ex-girlfriend.

On September 2, 2016, Brown pled guilty to aggravated battery as part of a plea agreement with the State. Under the plea agreement, in exchange for Brown's guilty plea to a single count of aggravated battery, the State agreed to dismiss the aggravated kidnapping and aggravated robbery charges. At sentencing, the State agreed to recommend that Brown serve the aggravated presumptive Kansas Sentencing Guidelines

Act (KSGA) grid sentence based on his criminal history score, which both parties believed to be criminal history score C.

On October 31, 2016, Brown's presentence investigation (PSI) report was filed. The PSI report stated that Brown's criminal history score was actually an A based on the aggregation of six prior person misdemeanor convictions. Brown's appointed attorney, Taryn Locke, filed a motion challenging the calculation of Brown's criminal history because Brown asserted that he did not have counsel when convicted of his prior person misdemeanors.

On December 6, 2016, Brown, acting pro se, moved to withdraw his aggravated battery guilty plea. In his motion, Brown argued that he had a right to withdraw his guilty plea because Locke and her supervisor, Mark Rudy, coerced him into entering his plea. He alleged that while explaining the plea agreement to him, Locke told him she would "go hard" on his son if he was called as a State's witness. Brown alleged that this statement was a "strong arm tactic[]," which made him feel like he needed to protect his son. He also asserted that Locke made him believe that the State would not return his property in State's custody unless he "entered a plea and did not appeal."

After Brown filed his motion, the trial court appointed Brown new counsel. The trial court also scheduled an evidentiary hearing on Brown's motion to withdraw plea.

At the March 2, 2017 evidentiary hearing, Brown testified that from the start of his case, he told Locke that he wanted to go to trial because he was innocent. He testified that before he agreed to accept the plea agreement, he had a meeting with Locke, and then he had a meeting with Rudy. Brown explained that at the meeting with Locke, Locke told him that should he decide to go to trial, she would "have to go hard on [his son]," who would be called as a State's witness. Brown explained that when Locke left this meeting, he had not accepted the plea agreement. Brown alleged that during the meeting with

3

Rudy, Rudy was "very persistent" about him taking the plea deal. He testified that Rudy "stood up on the desk and . . . told [him], [h]ow are you going to feel when your son is growing up knowing that he sent his father to prison?" He testified that these statements intimidated him. Therefore, at the end of his meeting with Rudy, he agreed to accept the State's plea agreement. He asserted that he believed he had to take the plea agreement to protect his son.

Next, Brown testified that at the plea hearing, Locke put the plea agreement in front of him and told him to sign it. According to Brown, Locke also told him to just agree to all the questions the judge asked him. Brown denied ever reading his plea agreement or his acknowledgment of rights and entry of plea form. He testified that he did not complain about Locke or Rudy to the judge at his plea hearing because Locke told him to "just answer yes to everything."

Locke testified that while representing Brown, Brown had told her that he intended to go to trial. And she testified that she intended to take Brown's case to trial. Locke testified that Brown had provided her with a defense, but she also testified that the results of her pretrial investigation supported that going to trial "[might] be too much of a risk." At the same time, Locke explained that Brown "was always very concerned about his son and wanted to be there for his son." Brown was maintaining that "that some of the statements his son gave [to the police] weren't accurate . . . ."

According to Locke, the plea agreement that Brown accepted came about after the prosecutor told her that she would have Brown's son testify if Brown went to trial; after telling Locke this, the prosecutor then asked Locke if "in the interest of not making a child testify is there anything we can do—." The plea agreement was the product of the prosecutor's and Locke's resulting conversation. Locke testified that when she presented the plea agreement to Brown, she told Brown that if he took the plea agreement, he would get out in time to "see his son graduate from high school." She testified that she "relayed

4

this to [Brown]" because he had suggested that he wanted to be out of prison in time to see his son graduate high school.

Locke also testified that she made sure that Brown understood that should he reject the plea agreement and have a trial, she would have to cross-examine his son:

> "I discussed with him the fact that I would have to be aggressive towards his son during cross-examination because it was my belief that his son was able to corroborate some of the allegations that the victim was making and could potentially be one of the worst witnesses against him and, because of his close relationship to his son, I wanted to make sure that he understood that and was comfortable with that."

Locke explained that after Brown rejected the plea agreement in their original meeting, she went to Rudy for assistance because she "absolutely" thought it was in "[Brown's] best interest" to enter the plea agreement. She testified that she believed Brown could benefit from talking to Rudy as a second opinion about the benefits of the plea agreement. She testified that she did not attend the meeting between Rudy and Brown. But following the meeting, Rudy told her that Brown had accepted the plea agreement.

Locke asserted that she went over the plea agreement and the defendant's acknowledgement of rights and entry of plea form with Brown before he entered his guilty plea. Locke explained that although she and Brown discussed his property in the State's custody throughout the case, they never discussed his property in the context of the plea agreement. She stated that when they did discuss the property, it was at the start of the case, when she "was able to get some property . . . released to [Brown's] brother" and after he had already entered his plea. After Brown had entered his plea, the prosecutor told her the State would release his remaining property following the passing of the appeal deadline. Locke testified that she sent letters about the release of his property to Brown, and these letters are in the record on appeal.

5

Rudy testified that he often meets with the clients of the attorneys he supervises in his office when they ask. Rudy explained that he met with Brown on Locke's request because both he and Locke believed that Brown had "a very reasonable plea offer on the table." He testified that before meeting with Brown, he familiarized himself with the facts of Brown's case. He testified that he could not independently recall the specifics of their meeting. Yet, he explained that since Brown's son was the State's key witness, "[he would have] almost [] certain[ly] . . . talked about the impact that a seven-year-old child testifying would have on a jury." He asserted that he would have given Brown his professional opinion that children, especially children who are testifying against a loved one, are credible witnesses who can harm a defendant's case. He also asserted that he could not recall any issues and made no record of any issues during the meeting.

Following the testimony, Brown asked that the trial court allow him to withdraw his plea, alleging that he had established good cause to do so based on the reasons stated in his pro se motion. The State responded that Brown had failed to establish that he had good cause to withdraw his plea under any of the factors listed in *State v. Edgar*, 281 Kan. 30, 36, 127 P.3d 986 (2006). The trial court agreed with the State.

In denying Brown's motion, the trial court first found that Brown's allegations were not credible because he never alleged that he had issues with his attorneys or the plea agreement during his plea colloquy. Then, the trial court rejected each of Brown's arguments to withdraw his plea, explaining:

> "And I think that, when it gets right down to it, there isn't a whole lot of disagreement on the facts. Mr. Brown has three basic complaints in the motion to withdraw plea:
>
> "The first is that he felt that he was being pressured by the things that his lawyers were saying to accept the plea;
>
> "Second, that he felt like he was being coerced because if he didn't take the plea, his son would suffer, in some respects, in the resulting trial;

6

"And third, that his property wasn't being released.

"So let me take these things one step at a time here. Any lawyer that represents Mr. Brown is going to have an ethical obligation to give back—to give Mr. Brown their best advice and their best opinion, and sometimes that advice is that there are weaknesses in the case. There are weaknesses in any case, and a good lawyer advises the client of what those weaknesses are. And in this case a glaring weakness is the defendant's son's testimony. The defendant's son puts the defendant in the home with the victim, puts the defendant in the home with the victim who has blood on her, he hears a fight, he's able to put the gun in the hand of the defendant.

"This is all damning testimony, and it's not ineffective assistance, nor is it coercion for a lawyer to discuss with her client that this is a witness; this witness, I have been told, will testify; this is what the anticipated testimony will be; and this is how we're going to have to deal with it if we elect to have a trial. That's not coercion; that's simply telling a client that this is what we can anticipate, and this is how we're going to have to deal with it. Any lawyer is going to tell Mr. Brown that. And at the end of the day, that's not coercion to explain this is what the reality of the trial will look like, these are the witnesses, this is what they're likely to say, this is what we're going to have to do to mitigate that.

"So the problem with the motion is that if I'm to find that giving frank and honest advice to a client is tantamount to coercion, then everybody has the option of withdrawing a guilty plea prior to sentence and there is no limit. You just simply change your mind and say, my lawyer told me that all these witnesses were going to testify and they were going to say all these bad things, and so I felt pressured. Well, what Ms. Locke told Mr. Brown about his son's testimony is consistent with what is contained in the probable cause affidavit, it's what is, apparently, consistent with things that were exchanged in discovery. And so, to me, that's not coercion; that's simply a lawyer doing her job.

"The issue with the property is—that issue exists no matter what. . . . Whether that property initially was lawfully obtained from Mr. Brown is irrelevant at that point. What's relevant is whether or not this evidence is, you know, material to the outcome of the case. And once the case is over with, either by plea—and there's no more appeal and there's no more need for the evidence, then it can be released. But that's just a fact of life that exists in any criminal case. And for a lawyer to explain to a client, this is why we can't get your property back, and these are the circumstances that have to exist before we

can get your property back, again, it's not coercion; it's just—it is an accurate portrayal of what has to happen in order for this property to be returned to Mr. Brown.

"So when we go through these factors, I can't make any finding that Ms. Locke or Mr. Rudy were incompetent in this case. The testimony is uncontroverted that there was an investigation by a competent investigator; that witnesses were located and interviewed; that information from those interviews was obtained that would ultimately be of some value to the defense; that the defense counsel was aware of what critical witnesses were going to testify and was having necessary conversations with Mr. Brown on what that anticipated testimony would be with respect to the seven-year-old child and with respect to what would need to happen if the child was called to testify and said in front of a jury what was anticipated he was going to say . . . I can't find that Mr. Brown was misled in anyway.

"It would seem to me that, at least at this stage, everything that was said to him was proper and was well within what an attorney needs to say to a client who is going to trial on these sorts of charges if that client is going to make a reasonable and intelligent decision whether to have a trial or whether to take a plea. You simply can't make a decision to take a plea without knowing the risks of trial, and the fact that an attorney is conveying the risks of trial is not coercion. It just isn't. It's a necessary conversation that any good defense attorney is going to have with a defendant.

"That the defendant understood what he was doing when he entered the plea. That's evident by the plea transcript. And Mr. Brown isn't telling me today that he misunderstood what he was doing. He knew that he was pleading guilty to a level 4, and he knew in exchange for that, that the level 1 and level 3 would be dismissed. There was no evidence that anything was happening that he misunderstood or that occurred in a way that he didn't anticipate.

"Finally, with respect to whether the proceedings in their entirety are fair. Again, I just recount that correct information was conveyed to Mr. Brown. A sound legal analysis was provided to Mr. Brown as to the risks and benefits of trial versus plea; that Mr. Brown was able to process that, and, at the end of the day, a very fair plea agreement was had that at this point, with Mr. Brown being an A felony—or an A criminal history, takes off the table the prospect of spending 653 months in prison.

"So I can't say that this process hasn't been fair to Mr. Brown. And it would seem to me that as I go through the *Edgar* factors, none of them have been present to the

8

degree that will allow Mr. Brown to withdraw the plea. So the motion will be overruled at this point."

Next, at sentencing, the parties agreed that Brown's correct criminal history score was B because the State could not establish Brown had an attorney for one of his person misdemeanor convictions. Based on Brown's criminal history score of B, the trial court sentenced Brown to 154 months' imprisonment followed by 36 months' postrelease supervision.

*Did the Trial Court Err by Denying Brown's Motion to Withdraw Plea?*

Brown asserts that the trial court abused its discretion when it denied his motion because good cause existed to allow him to withdraw his plea. Brown's claims on appeal can be divided into three arguments: (1) He argues that the trial court's decision was unreasonable because Locke's and Rudy's statements concerning his son while discussing the plea agreement were coercive; (2) he argues that the trial court's decision was based on an error of law because it "indicated that it could not find [that he] was coerced based upon [Locke's and Rudy's] statements"; and (3) he argues that the trial court's decision was based on an error of fact because it found that Locke had provided him "accurate information about the plea agreement." The State responds (1) that the trial court's findings regarding any coercion were reasonable and legally appropriate and (2) that Brown failed to raise his remaining argument about the alleged factual error below.

Appellate courts review a trial court's denial of a motion to withdraw a plea for an abuse of discretion. *State v. Fritz*, 299 Kan. 153, 154, 321 P.3d 763 (2014). "Judicial action constitutes an abuse of discretion if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact." *State v. Schaefer*, 305 Kan. 581, 587, 385 P.3d 918 (2016).

9

K.S.A. 2017 Supp. 22-3210(d)(1) provides that "[a] plea of guilty or nolo contendere, for good cause shown and within the discretion of the court, may be withdrawn at any time before sentence is adjudged." Our Supreme Court has explained that trial courts should consider these three factors, commonly called the "*Edgar* factors," when determining whether the defendant has established good cause to withdraw his or her plea: "(1) whether the defendant was represented by competent counsel; (2) whether the defendant was misled, coerced, mistreated, or unfairly taken advantage of; and (3) whether the plea was fairly and understandingly made." *Fritz*, 299 Kan. at 154 (citing *Edgar*, 281 Kan. at 36).

Here, Brown's main argument falls under the second *Edgar* factor because he alleges that Locke and Rudy coerced him by discussing his son while explaining the plea agreement. In his brief, Brown cites several cases where courts have held that confessions by defendants were involuntary when the police obtained the confessions after telling the defendants that they would lose custody of their children absent a confession. Brown likens his case to those cases. Specifically, Brown believes (1) that Locke's reference to seeing his son graduate from high school should he take the plea agreement, (2) that Locke's reference having to "go hard" on his son during cross-examination should he not take the plea agreement, and (3) that Rudy's reference to having his "son [] growing up knowing that he sent his father to prison" should he not take the plea agreement, puts him in the same position as the defendants who confessed to crimes after the police threatened to take away their children.

Nevertheless, this is not the case. To begin with, although the coerced police confessions and Brown's attorneys both referenced children, neither Locke nor Rudy threatened to take Brown's son away from him. Thus, Brown's comparison is distinguishable in this respect. More importantly, however, the roles that police officers and defense attorneys play during a defendant's case are entirely different. The police find and collect the evidence necessary for the prosecutor to convict defendants. Defense

10

attorneys work for the defendants, trying to find holes in the prosecution's case while also acting as their clients' advisor. Thus, Brown's analogy falls short of the mark.

Next, Brown's entire argument hinges on this court accepting that Locke and Rudy referenced his son while discussing the plea agreement to coerce him to accept the plea agreement. The trial court, however, found that both Locke's and Rudy's references to Brown's son in the context of explaining the plea agreement were appropriate. It also found that Brown's testimony was unbelievable. When considering a trial court's denial of a motion to withdraw plea, appellate courts do not reweigh the evidence or the credibility of witnesses. *Schaefer*, 305 Kan. at 594.

Moreover, the trial court found that Locke's and Rudy's references to Brown's son were appropriate partly because they were made in the context of explaining the risks and benefits of taking the plea agreement. The trial court specifically noted that references stemmed from their duty to *advise* Brown. Thus, in addition to finding that Brown's allegations of coercion were unbelievable, the trial court found that Locke's and Rudy's references to Brown's son related to their duty to advise Brown as a client.

Under Kansas Rule of Professional Conduct 2.1 (2018 Kan. S. Ct. R. 339), which addresses a lawyer's duty to advise their clients, lawyers should offer "candid advice." In addition, "[i]n rendering advice, a lawyer may refer not only to law but to other considerations such as moral, economic, social and political factors that may be relevant to the client's situation." As for the scope of a lawyer's advice, comment 1 to KRPC 2.1 states: "A client is entitled to straightforward advice expressing the lawyer's honest assessment. Legal advice often involves unpleasant facts and alternatives that a client may be disinclined to confront." 2018 Kan. S. Ct. R. 340. Comment 2 states:

"Advice couched in narrowly legal terms may be of little value to a client, especially where practical considerations, such as cost or effects on other people, are

11

predominant. . . . It is proper for a lawyer to refer to relevant moral and ethical considerations in giving advice. Although a lawyer is not a moral advisor as such, moral and ethical considerations impinge upon most legal questions and may decisively influence how the law will be applied." 2018 Kan. S. Ct. R. 340.

Here, Locke's comment about having to "go hard" on Brown's son if he refused the plea agreement constituted the "candid advice" required of an attorney given the circumstances of Brown's case. Clearly, this advice was warranted since Locke would have to attack Brown's son's credibility during cross-examination because his son's testimony would corroborate the victim's testimony. Moreover, when Locke commented on Brown seeing his son graduate from high school if he accepted the plea agreement, she was merely advising Brown on another consideration "relevant to [his] situation" as stated in KRPC 2.1. Again, at the evidentiary hearing, Locke testified that she made this comment because this "was one of [Brown's] concerns."

As for Rudy's alleged statement, we note that although Brown alleged that Rudy asked him "[h]ow [he was] going to feel when [his] son [was] growing up knowing that he sent his father to prison," Rudy never stated that he made this statement. Given the trial court's credibility determination against Brown, there is no reason for this court to accept that Rudy even made this statement. Regardless, even if this court were to assume that Rudy made this statement, as comment 2 to KRPC 2.1 states, an attorney may advise the client on moral and ethical considerations relevant to the client's situation. Certainly, in a case in which Brown consistently professed concern about his son's well-being, Rudy was not out of line asking Brown if he was sure he wanted to put his son in the position of testifying against him.

In summary, the trial court found that Locke's and Rudy's references to Brown's son were not made in a coercive manner. The trial court made this finding (1) because it found Brown's allegations of coercion unbelievable and (2) because it found that Locke's

12

and Rudy's references to Brown's son fell within their duty to advise Brown. This court must accept the trial court's credibility determinations. Moreover, a review of KRPC 2.1 establishes that Locke and Rudy were indeed merely complying with their duty to advise Brown. As a result, the trial court did not act unreasonably when it rejected this argument below.

Brown's second argument relates to his first. He contends that the trial court made an error of law because it "indicated that it could not find Brown was coerced based upon his counsels' statements" about his son and return of property because this constituted frank and honest advice. Brown seemingly argues that the trial court found that an attorney's honest advice could never be coercive. He notes that "there is no specific requirement to the coercion standards that [state] the involuntary action be based upon inaccurate information."

As with his first argument, however, Brown has ignored the trial court's credibility determination against him. Certainly, circumstances could arise where an attorney provides accurate advice to a client in a coercive manner. Such coercive advice would not comply with KRPC 2.1. But, in this case, the trial court found that Locke and Rudy did not coerce Brown when they referenced his son while discussing the plea agreement. Again, the trial court explicitly made a credibility determination against Brown while also finding that Locke's and Rudy's references fell within their duties to advise Brown. With the trial court's fact-finding that Locke and Rudy did not reference his son in a coercive manner, Brown's underlying argument must fail. See *Schaefer*, 305 Kan. at 594 (holding that appellate courts do not reweigh the evidence or the credibility of witnesses). Moreover, despite Brown's assertion to the contrary, the trial court never "indicated" that attorneys could not coerce clients with accurate advice. Instead, its finding was that under the facts of Brown's case, Locke's and Rudy's advice was not coercive. Thus, Brown's entire argument is meritless.

13

Brown's last argument is that the trial court made an error of fact because it found that Locke had "provided accurate information about the plea agreement." Tellingly, Brown does not pinpoint what "accurate information" about the plea agreement the trial court was referencing in making this finding. All the same, Brown goes on to complain that he entered his plea agreement believing that his criminal history score was C but was ultimately sentenced with a criminal history score B. The State argues that this court should not consider this argument because Brown is raising it for the first time on appeal.

The State's argument is correct. At no point below did Brown complain about a mutual mistake as to his criminal history score. Further, the trial court made no findings or rulings regarding any mutual mistake as to Brown's criminal history score because Brown did not raise the argument below.

On appeal, Brown tries to connect his new mutual mistake argument to Locke's statement that he would be out of prison in time to see his son graduate from high school, Brown asserts that Locke's calculation was based on her mistaken belief that he had a criminal history score of C. Nevertheless, whether Locke's comment about his son graduating high school was coercive and whether the parties made a mutual mistake as to his criminal history score are two very different things.

Absent limited exceptions, issues not raised before the trial court cannot be raised for the first time on appeal. *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014). In his brief, Brown has not argued that any exception exists allowing him to raise this argument for the first time on appeal. Actually, Brown has not acknowledged that he is raising this argument for the first time on appeal. Supreme Court Rule 6.02(a)(5) (2018 Kan. S. Ct. R. 34) requires appellants to explain why an issue not raised below may be raised for the first time on appeal. Failure to comply with Rule 6.02(a)(5) constitutes a failure to properly brief the argument, resulting in abandonment of the argument. *State v. Godfrey*, 301 Kan. 1041, 1044, 350 P.3d 1068 (2015). As a result, Brown cannot raise his mutual

mistake argument for the first time on appeal, and his failure to comply with Rule 6.02(a)(5) also precludes this court's review.

For all these reasons, the trial court properly applied its discretion when it denied Brown's presentencing motion to withdraw his plea.

Affirmed in part and remanded to the trial court with directions to enter a nunc pro tunc journal entry of judgment deleting the errant reference to the aggravated kidnapping conviction.